NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE
This case requires us to consider whether a public official may, consistent with the First Amendment, "block" a person from his Twitter account in response to the political views that person has expressed, and whether the analysis differs because that public official is the President of the United States. The answer to both questions is no.
Our analysis proceeds as follows. We first set forth the background facts regarding Twitter as a platform, the @realDonaldTrump account that is the center of this dispute, the plaintiffs, and this case's procedural history. Because defendants object to our adjudication of this case based on plaintiffs' lack of standing, we then turn-as we must-to the consideration of those jurisdictional arguments. We conclude that the plaintiffs have established the prerequisites to our jurisdiction: they have experienced a legally cognizable injury, those injuries are traceable to the President and Daniel Scavino's conduct, and a favorable judicial decision on the merits is likely to redress those injuries.
We then proceed to the substance of plaintiffs' First Amendment claims. We hold that portions of the @realDonaldTrump account-the "interactive space" where Twitter users may directly engage with the content of the President's tweets-are properly analyzed under the "public forum" doctrines set forth by the Supreme Court, that such space is a designated public forum, and that the blocking of the plaintiffs based on their political speech constitutes viewpoint discrimination that violates the First Amendment. In so holding, we reject the defendants' contentions that the First Amendment does not apply in this case and that the President's personal First Amendment interests supersede those of plaintiffs.
Finally, we consider what form of relief should be awarded, as plaintiffs seek both declaratory relief and injunctive relief. While we reject defendants' categorical assertion that injunctive relief cannot ever be awarded against the President, we nonetheless conclude that it is unnecessary to enter that legal thicket at this time. A declaratory judgment should be sufficient, as no government official-including the President-is above the law, and all government officials are presumed to follow the law as has been declared.
I. Background
The facts presented below are drawn almost entirely from the stipulation of facts between the parties, see Stipulation, Sept. 28, 2017, ECF No. 30-1, which "applies *550 exclusively to this litigation and does not constitute an admission for purposes of any other proceeding," Stip. at 1.[1]
A. The Twitter Platform
"Twitter is a social media platform with more than 300 million active users worldwide, including some 70 million in the United States." Stip. ¶ 13. A " 'user' is an individual who has created an account on the platform." Stip. ¶ 14. "A Twitter user must have an account name, which is an @ symbol followed by a unique identifier (e.g., @realDonaldTrump), and a descriptive name (e.g., Donald J. Trump). The account name is called the user's 'handle.' " Stip. ¶ 16.
Twitter "allows users to post short messages," Stip. ¶ 13, which are called "tweets," Stip. ¶ 14. Tweets may be "up to [280] characters in length,"[2] may "include photographs, videos, and links," and are posted "to a webpage on Twitter that is attached to the user's account." Stip. ¶ 14. "An individual 'tweet' comprises the tweeted content (i.e., the message, including any embedded photograph, video, or link), the user's account name (with a link to the user's Twitter webpage), the user's profile picture, the date and time the tweet was generated, and the number of times the tweet has been replied to ..., retweeted by ..., or liked by ... other users." Stip. ¶ 17.
The Twitter webpage that displays the collection of a user's tweets is known as the user's "timeline." Stip. ¶ 15. "When a user generates a tweet, the timeline updates immediately to include that tweet," and "[a]nyone who can view a user's Twitter webpage can see the user's timeline." Stip. ¶ 15. "A user's Twitter webpage may also include a short biographical description; a profile picture, such as a headshot; a 'header' image, which appears as a banner at the top of the webpage; the user's location; a button labeled 'Message,' which allows two users to correspond privately; and a small sample of photographs and videos posted to the user's timeline, which link to a full gallery." Stip. ¶ 16. "By default, Twitter webpages and their associated timelines are visible to everyone with internet access, including those who are not Twitter users. However, although non-users can view users' Twitter webpages (if the accounts are public), they cannot interact with users on the Twitter platform." Stip. ¶ 18.
A defining feature of Twitter is a user's ability "to repost or respond to others' messages, and to interact with other Twitter users in relation to those messages." Stip. ¶ 13. "Beyond posting tweets ..., Twitter users can engage with one another in a variety of ways." Stip. ¶ 21. First, "they can 'retweet'-i.e., repost-the tweets of other users, either by posting them directly to their own followers or by 'quoting' them in their own tweets. When a user retweets a tweet, it appears on the user's timeline in the same form as it did on the original user's timeline, but with a notation indicating that the post was retweeted." Stip. ¶ 21. Second, "[a] Twitter user can also reply to other users' tweets. Like any other tweet, a reply can be up to [280] characters in length and can include photographs, videos, and links." Stip. ¶ 22. This reply may be viewed in two places:
*551 when a user sends a reply, "the reply appears on the user's timeline under a tab labeled 'Tweets & replies.' " However, the reply may also be accessed from the feed of the user sending the tweet being replied to: "by clicking on the tweet that prompted the reply[,] the reply will appear below the original tweet, along with other users' replies to the same tweet." Stip. ¶ 22. Third, "[a] Twitter user can also 'favorite' or 'like' another user's tweet by clicking on the heart icon that appears under the tweet. By 'liking' a tweet, a user may mean to convey approval or to acknowledge having seen the tweet." Stip. ¶ 24. Fourth, "[a] Twitter user can also 'mention' another user by including the other user's Twitter handle in a tweet. A Twitter user mentioned by another user will receive a 'notification' that he or she has been mentioned in another user's tweet." Stip. ¶ 25. Finally, "Twitter users can subscribe to other users' messages by 'following' those users' accounts. Users generally can see all tweets posted or retweeted by accounts they have followed." Stip. ¶ 19. "Tweets, retweets, replies, likes, and mentions are controlled by the user who generates them. No other Twitter user can alter the content of any retweet or reply, either before or after it is posted. Twitter users cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts." Stip. ¶ 26.
Because a retweet or a reply to a tweet is itself a tweet, each retweet and reply, recursively, may be retweeted, replied to, or liked. "A Twitter user can also reply to other replies. A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to-replies nested below the replies to which they respond. The collection of replies and replies-to-replies is sometimes referred to as a 'comment thread.' " Stip. ¶ 23. "Twitter is called a 'social' media platform in large part because of comment threads, which reflect multiple overlapping 'conversations' among and across groups of users." Stip. ¶ 23.
In addition to these means of interaction, Twitter offers two means of limiting interaction with other users: blocking and muting. First, "[a] user who wants to prevent another user from interacting with her account on the Twitter platform can do so by 'blocking' that user. (Twitter provides users with the capability to block other users, but it is the users themselves who decide whether to make use of this capability.) When a user is signed in to a Twitter account that has been blocked, the blocked user cannot see or reply to the blocking user's tweets, view the blocking user's list of followers or followed accounts, or use the Twitter platform to search for the blocking user's tweets. The blocking user will not be notified if the blocked user mentions her or posts a tweet; nor, when signed in to her account, will the blocking user see any tweets posted by the blocked user." Stip. ¶ 28. "If, while signed in to the blocked account, the blocked user attempts to follow the blocking user, or to access the Twitter webpage from which the user is blocked, the blocked user will see a message indicating that the other user has blocked him or her from following the account and viewing the tweets associated with the account." Stip. ¶ 29.
While blocking precludes the blocked user from directly interacting with the blocking user's tweets-including from replying or retweeting those tweets, blocking does not eliminate all interaction between the blocked user and the blocking user. "After a user has been blocked, the blocked user can still mention the blocking user. Tweets mentioning the blocking user will be visible to anyone who can view the blocked user's tweets and replies. A blocked user can also reply to users who have replied to the blocking user's tweets, *552 although the blocked user cannot see the tweet by the blocking user that prompted the original reply. These replies-to-replies will appear in the comment thread, beneath the reply to the blocking user's original tweet." Stip. ¶ 30. Further, "[i]f a blocked user is not signed in to Twitter, he or she can view all of the content on Twitter that is accessible to anyone without a Twitter account." Stip. ¶ 31.
As distinguished from blocking, "[m]ut[ing] is a feature that allows [a user] to remove an account's Tweets from [his or her] timeline without unfollowing or blocking that account. Muted accounts will not know that [the muting user has] muted them and [the muting user] can unmute them at any time." How to Mute Accounts on Twitter, Twitter (last visited May 22, 2018), https://help.twitter.com/en/using-twitter/twitter-mute [hereinafter How to Mute ].[3] "Muted accounts can follow [the muting user] and [the muting user] can follow muted accounts. Muting an account will not cause [the muting user] to unfollow them." Id. If a muting user follows a muted user, "[r]eplies and mentions by the muted account will still appear in [the muting user's] Notifications tab," and "[w]hen [the muting user] click[s] or tap[s] into a conversation, replies from muted accounts will be visible." Id. By contrast, if a muting user does not follow a muted user, "[r]eplies and mentions will not appear in [the muting user's] Notifications tab," and "[w]hen [the muting user] click[s] or tap[s] into a conversation, replies from muted accounts will be not visible." Id.
B. The @realDonaldTrump Account
"Donald Trump established @realDonaldTrump in March 2009. Before his inauguration, he used this account to tweet about a variety of topics, including popular culture and politics. Since his inauguration in January 2017, President Trump has used the @realDonaldTrump account as a channel for communicating and interacting with the public about his administration. He also has continued to use the account, on occasion, to communicate about other issues not directly related to official government business." Stip. ¶ 32. "The Twitter page associated with the account is registered to Donald J. Trump, '45th President of the United States of America, Washington, D.C.' " Stip. ¶ 35. "The @realDonaldTrump account is generally accessible to the public at large without regard to political affiliation or any other limiting criteria." Stip. ¶ 36. "[A]ny member of the public can view his tweets without being signed in to Twitter, and anyone who wants to follow the account can do so. President Trump has not issued any rule or statement purporting to limit (by form or subject matter) the speech of those who reply to his tweets." Stip. ¶ 36.
Since the President's inauguration, the @realDonaldTrump account has been operated with the assistance of defendant Daniel Scavino, "the White House Social Media Director and Assistant to the President [who] is sued in his official capacity only." Stip. ¶ 12. "With the assistance of Mr. Scavino in certain instances, President Trump uses @realDonaldTrump, often multiple times a day, to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; to challenge media organizations whose coverage of his Administration he believes to be unfair; and for other statements, including on occasion statements unrelated to official government business.
*553 President Trump sometimes uses the account to announce matters related to official government business before those matters are announced to the public through other official channels." Stip. ¶ 38. "For example, the President used @realDonaldTrump to announce on June 7, 2017, for the first time, that he intended to nominate Christopher Wray for the position of FBI director." Stip. ¶ 38. Since the parties' stipulation, the President has also used the @realDonaldTrump account in removing then-Secretary of State Rex Tillerson[4] and then-Secretary of Veterans Affairs David Shulkin.[5] Additionally, "[t]he National Archives and Records Administration has advised the White House that the President's tweets from @realDonaldTrump ... are official records that must be preserved under the Presidential Records Act." Stip. ¶ 40.
"Mr. Scavino in certain instances assists President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account. Other White House aides besides Mr. Scavino will, in certain instances, also suggest content for @realDonaldTrump tweets. President Trump also sometimes dictates tweets to Mr. Scavino, who then posts them on Twitter. President Trump and/or Mr. Scavino sometimes retweet the tweets of those who participate in comment threads associated with the @realDonaldTrump account." Stip. ¶ 39. "Mr. Scavino has access to the @realDonaldTrump account, including the access necessary to block and unblock individuals from the @realDonaldTrump account," Stip. ¶ 12, and has explained that @realDonaldTrump is a channel "through which 'President Donald J. Trump ... [c]ommunicat[es] directly with you, the American people!' " Stip. ¶ 37 (alterations and omissions in original).
Twitter users engage frequently with the President's tweets. "Typically, tweets from @realDonaldTrump generate thousands of replies from members of the public, and some of those replies generate hundreds or thousands of replies in turn." Stip. ¶ 41. "For example, on July 26, 2017, President Trump issued a series of tweets ... announcing 'that the United States Government will not accept or allow ... Transgender individuals to serve' in the military, and after less than three hours, the three tweets, collectively, had been retweeted nearly 70,000 times, liked nearly 180,000 times, and replied to about 66,000 times." Stip. ¶ 41 (second omission in original). "This level of engagement is typical for President Trump's tweets," Stip. ¶ 42, which "frequently receive 15,000-20,000 retweets or more," Stip. ¶ 42, and "are each replied to tens of thousands of times," Stip. ¶ 43.
C. The Individual Plaintiffs
Rebecca Buckwalter, Philip Cohen, Holly Figueroa, Eugene Gu, Brandon Neely, Joseph Papp, and Nicholas Pappas (collectively, the "individual plaintiffs"), are all Twitter users. Stip. ¶¶ 2-8. They each tweeted a message critical of the President or his policies in reply to a tweet from the @realDonaldTrump account. Stip. ¶¶ 46-52. Each individual plaintiff had his or her account blocked shortly thereafter, and each account remains blocked. Stip. ¶¶ 46-52. Defendants do "not contest Plaintiffs'
*554 allegation that the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies." Stip. at 1.
"As a result of the President's blocking of the Individual Plaintiffs from @realDonaldTrump, the Individual Plaintiffs cannot view the President's tweets; directly reply to these tweets; or use the @realDonaldTrump webpage to view the comment threads associated with the President's tweets while they are logged in to their verified accounts." Stip. ¶ 54. However, "[t]he Individual Plaintiffs can view tweets from @realDonaldTrump when using an internet browser or other application that is not logged in to Twitter, or that is logged in to a Twitter account that is not blocked by @realDonaldTrump." Stip. ¶ 55. Additionally, "[s]ome of the Individual Plaintiffs have established second accounts so that they can view the President's tweets." Stip. ¶ 56.
Blocking does not completely eliminate the individual plaintiffs' ability to interact with the President's tweets. "The Individual Plaintiffs can view replies to @realDonaldTrump tweets, and can post replies to those replies, while logged in to the blocked accounts. Replies-to-replies appear in the comment threads that originate with @realDonaldTrump tweets and are visible to users who have not blocked (or been blocked by) the Individual Plaintiffs." Stip. ¶ 57. "Although the Individual Plaintiffs who have been blocked have the ability to view and reply to replies to @realDonaldTrump tweets, they cannot see the original @realDonaldTrump tweets themselves when signed in to their blocked accounts, and in many instances it is difficult to understand the reply tweets without the context of the original @realDonaldTrump tweets." Stip. ¶ 58. While "[i]n the past, Plaintiffs Holly Figueroa, Eugene Gu, and Brandon Neely used a third-party service called Favstar that could be used by blocked users to view and reply to a blocking account's tweets if the blocked user established a Favstar account and followed certain steps[,] [t]he parties' understanding is that it is no longer possible for blocked users to use the Favstar service to view and reply to a blocking account's tweets." Stip. ¶ 59.
These workarounds "require [the individual plaintiffs] to take more steps than non-blocked, signed-in users to view the President's tweets." Stip. ¶ 55. "All of the Individual Plaintiffs have found these various 'workarounds' to be burdensome and to delay their ability to respond to @realDonaldTrump tweets. As a result, four of the Individual Plaintiffs do not use them and the others use them infrequently." Stip. ¶ 60.
D. The Knight Institute
The "Knight First Amendment Institute at Columbia University is a 501(c)(3) organization that works to defend and strengthen the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. Staff at the Knight First Amendment Institute operate a Twitter account under the handle @knightcolumbia, and this account follows @realDonaldTrump." Stip. ¶ 1. In contrast to the individual plaintiffs, "[t]he Knight Institute has not been blocked from the @realDonaldTrump account." Stip. ¶ 61. However, "[t]he Knight Institute desires to read comments that otherwise would have been posted by the blocked Plaintiffs, and by other accounts blocked by @realDonaldTrump, in direct reply to @realDonaldTrump tweets," Stip. ¶ 61, and "[t]he @knightcolumbia account follows Professor Cohen's account, @familyunequal," Stip. ¶ 62. "As of August 22, 2017," however, "the Knight Institute did *555 not follow the other six Individual Plaintiffs on Twitter." Stip. ¶ 62.
E. Procedural History
The Knight Institute and the individual plaintiffs filed suit in July 2017, seeking declaratory and injunctive relief and naming the President, Scavino, and then-White House Press Secretary Sean Spicer as defendants. Compl., July 11, 2017, ECF No. 1. After Spicer's resignation in late July 2017, his successor as White House Press Secretary, Sarah Huckabee Sanders, and White House Communications Director Hope Hicks were substituted in his place pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.[6] See Letter from Jameel Jaffer and Michael H. Baer to the Court, Sept. 25, 2017, ECF No. 28. After entering into the stipulation of facts, defendants moved for summary judgment on October 13, 2017 and plaintiffs cross-moved for summary judgment on November 3, 2017. We heard oral argument on March 8, 2018.
II. Standing
Before turning to the merits of this dispute, "we are required to assure ourselves of jurisdiction." Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J., 760 F.3d 227, 237 n.11 (2d Cir. 2014). At bottom, the "judicial Power of the United States" is constitutionally limited to "Cases" and "Controversies." U.S. Const. art. III, § 2. Because "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy," Spokeo, Inc. v. Robins, --- U.S. ----, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016), "[w]hether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit," Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d 357, 361 (2d Cir. 2003). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).
The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements." Spokeo, 136 S.Ct. at 1547 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id."The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." Id."Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Defs. of Wildlife, 504 U.S. at 561, 112 S.Ct. 2130. "In response to a summary judgment motion, *556 however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' " supporting its standing. Id. (quoting Fed. R. Civ. P. 56(e) ). Conversely, in order to grant summary judgment in a plaintiff's favor, there must be no genuine issue of material fact as to that plaintiff's standing.
Because "the standing inquiry requires careful judicial examination of ... whether the particular plaintiff is entitled to an adjudication of the particular claims asserted," Allen v. Wright, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (emphasis added), standing must be assessed as to each plaintiff and each "plaintiff must demonstrate standing separately for each form of relief sought," Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Further, because Article III does not "permit[ ] suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff," standing must also be assessed as against each defendant. Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012).
We consider the three elements of standing as to the individual plaintiffs before turning to the Knight Institute's standing.
A. Injury-in-Fact
"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, 136 S.Ct. at 1548 (internal quotation marks omitted). However, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (alteration and omission in original) (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ). Though "[p]ast wrongs" serve as "evidence bearing on whether there is a real and immediate threat of repeated injury," id. (internal quotation marks omitted), "[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement," Deshawn E. ex rel. Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998). Rather, that plaintiff "must show a likelihood that he or she will be injured in the future." Id. [7]
"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (quoting Defs. of Wildlife, 504 U.S. at 565 n.2, 112 S.Ct. 2130 ). Therefore, "threatened injury must be 'certainly impending' to constitute injury in fact" that satisfies Article III's requirements. Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ). A "theory of standing [that] relies on a highly attenuated chain of possibilities[ ] does not satisfy the requirement that threatened injury must be certainly *557 impending," nor does an "objectively reasonable likelihood" that the injury will occur. Clapper, 568 U.S. at 410, 133 S.Ct. 1138 (citing Summers v. Earth Island Inst., 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009), and Whitmore, 495 U.S. at 157-60, 110 S.Ct. 1717 ).
Further, the injury must be concrete and particularized. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' " Spokeo, 136 S.Ct. at 1548 (quoting Defs. of Wildlife, 504 U.S. at 560 n.1, 112 S.Ct. 2130 ). The plaintiff "must have a personal stake in the outcome" and must assert "something more than generalized grievances." United States v. Richardson, 418 U.S. 166, 179-80, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (internal quotation marks omitted). An "impact on him [that] is plainly undifferentiated and common to all members of the public" is insufficient, id. at 176, 94 S.Ct. 2940 (internal quotation marks omitted), as is a mere "special interest" in a given problem without more, Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). At the same time, "standing is not to be denied simply because many people suffer the same injury." Massachusetts v. EPA, 549 U.S. 497, 526 n.24, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." Spokeo, 136 S.Ct. at 1548 n.7.
Concreteness "is quite different from particularization." Id. at 1548. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." Id. The term " '[c]oncrete' is not, however, necessarily synonymous with 'tangible,' " and "intangible injuries"-including infringements on the exercise of First Amendment rights-"can nevertheless be concrete." Id. at 1549 (citing Pleasant Grove City v. Summum, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009), and Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ).
In this case, the record establishes a number of limitations on the individual plaintiffs' use of Twitter as a result of having been blocked. As long as they remain blocked, "the Individual Plaintiffs cannot view the President's tweets; directly reply to these tweets; or use the @realDonaldTrump webpage to view the comment threads associated with the President's tweets while they are logged in to their verified accounts." Stip. ¶ 54. While alternative means of viewing the President's tweets exist, Stip. ¶¶ 55-56, and the individual plaintiffs "have the ability to view and reply to replies to @realDonaldTrump tweets, they cannot see the original @realDonaldTrump tweets themselves when signed in to their blocked accounts, and in many instances it is difficult to understand the reply tweets without the context of the original @realDonaldTrump tweets," Stip. ¶ 58.
These limitations are cognizable injuries-in-fact. The individual plaintiffs' ability to communicate using Twitter has been encumbered by these limitations (regardless of whether they are harms cognizable under the First Amendment). Further, as long as the individual plaintiffs remain blocked, their ability to communicate using Twitter will continue to be so limited. Stip. ¶¶ 28-31, 54. The individual plaintiffs have experienced past harm in that their ability to use Twitter to interact with the President's tweets has been limited, and-absent some unforeseen change to the blocking functionality-they will continue to experience that harm as long as they *558 are blocked. These future harms are not only certainly impending as required for standing purposes, but they are in fact virtually certain because the individual plaintiffs continue to be blocked.[8]
These injuries are also concrete and particularized. While they are not tangible in nature, these limitations are squarely within the "intangible injuries" previously determined to be concrete. See Spokeo, 136 S.Ct. at 1549. These limitations are also particularized, in that they have affected and will affect the individual plaintiffs in a "personal and individual way"-each contends that his or her personal First Amendment rights have been and will continue to be encumbered, and the ability to communicate has been and will be limited because of each individual plaintiff's personal ownership of a Twitter account that was blocked. See id. at 1548. We accordingly conclude that the individual plaintiffs have established imminent injury-in-fact that is concrete and particularized, which is sufficient for Article III standing purposes.
B. Causation
The causation requirement demands that the complained-of injury "fairly can be traced to the challenged action of the defendant" as opposed to "injury that results from the independent action of some third party not before the court." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). While the Supreme Court has often defined the causation prong of standing with reference to a defendant's challenged action, it has also referred to a defendant's "conduct." See, e.g., Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) ). Accordingly, an omission may provide a basis for standing just as an affirmative action may. See Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l., 790 F.3d 411, 417 (2d Cir. 2015) (describing causation as requiring "that the injury was in some sense caused by the opponent's action or omission"); see also, e.g., Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 378 (D.C. Cir. 2017) (referring to a "defendant's action or omission").
"The traceability requirement for Article III standing means that the plaintiff must 'demonstrate a causal nexus between the defendant's conduct and the injury.' " Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) (quoting Heldman v. Sobol, 962 F.2d 148, 156 (2d Cir. 1992) ). "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." Lexmark Int'l, Inc. v. Static Control Components, Inc., --- U.S. ----, 134 S.Ct. 1377, 1391 n.6, 188 L.Ed.2d 392 (2014).
1. Sarah Huckabee Sanders
Plaintiffs have not established standing against defendant Sanders. "Ms. Sanders does not have access to the @realDonaldTrump account," Stip. ¶ 11, and plaintiffs do not suggest that Sanders *559 blocked the individual plaintiffs in the first instance or that she could unblock the individual plaintiffs upon a legal finding that such blocking is constitutionally impermissible. Accordingly, plaintiffs do not challenge any action that Sanders has taken (or can take). The individual plaintiffs' injuries-in-fact are not attributable to Sanders, and they accordingly lack Article III standing to sue her. See, e.g., Simon, 426 U.S. at 41-42, 96 S.Ct. 1917. Summary judgment will therefore be granted in favor of defendant Sanders.
2. Daniel Scavino
In contrast to Sanders, "Mr. Scavino has access to the @realDonaldTrump account, including the access necessary to block and unblock individuals from the @realDonaldTrump account." Stip. ¶ 12. Indeed, "Mr. Scavino posts messages on behalf of President Trump to @realDonaldTrump and other social media accounts," Stip. ¶ 12, and "assists President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account," Stip. ¶ 39. While Scavino unquestionably has access to the @realDonaldTrump account and participates in its operation, such involvement does not, by itself, establish that the plaintiffs' injuries may be fairly traced to an action taken by Scavino as required for standing purposes. The only evidence in the record as to Scavino pertains to this general involvement, and the record is devoid of any suggestion that he blocked the individual plaintiffs.
Nonetheless, the Second Circuit and several other Courts of Appeals have recognized that in cases seeking prospective relief, an official defendant's lack of personal involvement in past constitutional violations does not render that defendant an improper one for purposes of prospective declaratory or injunctive relief from continuing violations-provided that the defendant maintains some connection to, or responsibility for, the continuing violation. See Koehl v. Dalsheim, 85 F.3d 86, 89 (2d Cir. 1996) (holding that "the complaint also sought injunctive relief against [a defendant official], and dismissal of that claim was not warranted" despite the "lack of an allegation of personal involvement" warranting dismissal of a damages claim); Pugh v. Goord, 571 F.Supp.2d 477, 517 (S.D.N.Y. 2008) (Sullivan, J.) (requiring "only that a defendant have a 'connection' with the [allegedly unconstitutional] act, and not more" (citing, inter alia, Dairy Mart Convenience Stores, Inc. v. Nickel (In re Dairy Mart Convenience Stores, Inc.), 411 F.3d 367, 372-73 (2d Cir. 2005) ) ); Loren v. Levy, No. 00 Civ. 7687, 2003 WL 1702004, at *11 (S.D.N.Y. Mar. 31, 2003) (Chin, J.) ("[A]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." (quoting Davidson v. Scully, 148 F.Supp.2d 249, 254 (S.D.N.Y. 2001) ), aff'd, 120 Fed.Appx. 393 (2d Cir. 2005) ; see also Parkell v. Danberg, 833 F.3d 313, 332 (3d Cir. 2016) ("Our conclusion that the State Defendants lacked personal involvement in past constitutional violations does not preclude [plaintiff] from obtaining prospective injunctive relief for ongoing violations."); Pouncil v. Tilton, 704 F.3d 568, 576 (9th Cir. 2012) (concluding that a named defendant official was a "proper defendant on a claim for prospective injunctive relief ... because he would be responsible for ensuring that injunctive relief was carried out, even if he was not personally involved in the decision giving rise to [plaintiff's] claims"); Gonzalez v. Feinerman, 663 F.3d 311, 315 (7th Cir. 2011) (per curiam) ("[S]ince [plaintiff] also seeks injunctive relief it is irrelevant whether [the defendant official] participated in the alleged violations.").
While this line of cases developed in the context of suits against state officials and *560 the Ex parte Young exception to state sovereign immunity under the Eleventh Amendment, see In re Dairy Mart, 411 F.3d at 372-73 ; see also Finstuen v. Crutcher, 496 F.3d 1139, 1151 (10th Cir. 2007) ; Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1341-42 (Fed. Cir. 2006), it is no less applicable to the present context of suits against federal officials.[9] As the Supreme Court has explained, suits seeking prospective relief against federal officials alleging continuing constitutional violations and those against state officials share common characteristics and a common historical basis: "we have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials." Armstrong v. Exceptional Child Ctr., Inc., --- U.S. ----, 135 S.Ct. 1378, 1384, 191 L.Ed.2d 471 (2015) (citations omitted). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." Id. (emphasis added).
The lack of a prior personal involvement requirement in actions seeking prospective relief does not vitiate standing's traceability requirement, as defendants suggest. The defendant official's connection to the ongoing violation, see, e.g., Parkell, 833 F.3d at 332 ; Pouncil, 704 F.3d at 576 ; Gonzalez, 663 F.3d at 315 ; Pugh, 571 F.Supp.2d at 517, satisfies the traceability requirement. Assuming the existence of an ongoing violation, an official who has some connection to the violation-i.e., one who may prospectively remedy it-will contribute to the violation and the future injury-in-fact that it may inflict by failing to do so. Here, assuming that the blocking of the individual plaintiffs infringes their First Amendment rights, those rights will continue to be infringed as long as they remain blocked. Cf. Lyons, 461 U.S. at 102, 103 S.Ct. 1660 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." (omission in original) (quoting O'Shea, 414 U.S. at 495-96, 94 S.Ct. 669 ) ). Because Scavino has the ability to unblock the plaintiffs, any future injury will be traceable to him because it will have resulted, at least in part, from his failure to unblock them. Ultimately, as defendants' quoted authority explains, "[s]tanding should be recognized as long as the duty claim survives, but becomes irrelevant when litigation reaches the point of rejecting the duty." 13A Charles A. Wright et al., Federal Practice & Procedure, § 3531.5 (3d ed.) (Westlaw 2018). Because we must consider standing before the merits, we have not at this point in the analysis considered plaintiffs' claim that the First Amendment imposes a duty on Scavino to unblock the individual plaintiffs.[10] We therefore conclude *561 that the traceability requirement of standing is satisfied as to Scavino.
3. The President
The record definitively establishes that the plaintiffs' injuries-in-fact are directly traceable to the President's actions. "The President blocked [each of the individual plaintiffs] from the @realDonaldTrump account." Stip. ¶¶ 46-52; see also Stip. ¶ 54 (referring to "the President's blocking of the Individual Plaintiffs"). The causation requirement is therefore amply satisfied as to the President.
C. Redressability
In order for redressability to be satisfied, "it must be likely that a favorable judicial decision will prevent or redress the injury." Earth Island Inst., 555 U.S. at 493, 129 S.Ct. 1142. That is, redressability must be "likely, as opposed to merely speculative," Laidlaw, 528 U.S. at 181, 120 S.Ct. 693, but it "is not a demand for mathematical certainty," Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d 581, 602 (2d Cir. 2016) (quoting Toll Bros., Inc. v. Township of Readington, 555 F.3d 131, 143 (3d Cir. 2009) ). "All that is required is a showing that such relief be reasonably designed to improve the opportunities of a plaintiff not otherwise disabled to avoid the specific injury alleged." Huntington Branch, NAACP v. Town of Huntington, 689 F.2d 391, 394 (2d Cir. 1982).
Further, any relief provided need not be complete. "The redressability element of the Article III standing requirement and the 'complete relief' referred to by Rule 19 [of the Federal Rules of Civil Procedure] are not identical," Defs. of Wildlife, 504 U.S. at 570 n.4, 112 S.Ct. 2130 (emphasis omitted) (plurality opinion),[11] and a plaintiff "need not show that a favorable decision will relieve his every injury," Larson v. Valente, 456 U.S. 228, 244 n.15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). As the Tenth Circuit has subsequently explained, "if the law required that the requested relief afford complete redress, the Supreme Court would not have allowed Massachusetts to proceed against the EPA, as there was no guarantee a favorable decision would mitigate future environmental damage, much less redress it completely." Consumer Data Indus. Ass'n v. King, 678 F.3d 898, 905 (10th Cir. 2012) (citing Massachusetts v. EPA, 549 U.S. at 526, 127 S.Ct. 1438 ); see also WildEarth Guardians v. U.S. Dep't of Agric., 795 F.3d 1148, 1156 n.5 (9th Cir. 2015) ("Partial relief ... would qualify as redress for standing purposes." (citing Meese v. Keene, 481 U.S. 465, 476-77, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) ) ). "[E]ven if [plaintiffs] would not be out of the woods, a favorable decision would relieve their problem 'to some extent,' which is all the law requires." Consumer Data, 678 F.3d at 903.
We therefore conclude that the plaintiffs' injuries may be redressed through declaratory relief or through injunctive relief directed at Scavino: the *562 plaintiffs' future injuries will be prevented if they are unblocked-an action within Scavino's power. Stip. ¶ 12. Nor is this redressability undercut, as defendants suggest, by the President's ability to block individuals. The D.C. Circuit has explained that "the partial relief [the plaintiff] can obtain against subordinate executive officials is sufficient for redressability, even recognizing that the President has the power, if he so chose, to undercut this relief," Swan v. Clinton, 100 F.3d 973, 980-81 (D.C. Cir. 1996), reasoning that has since been adopted by the Eleventh Circuit, see Made in the USA Found. v. United States, 242 F.3d 1300, 1309-11 (11th Cir. 2001). Any declaratory or injunctive relief as to Scavino that results in the unblocking of the individual plaintiffs will redress at least some of their future injury, regardless of whether the President could, theoretically, reblock them subsequently. And of course, "we may assume it is substantially likely that the President and other executive ... officials would abide by an authoritative interpretation of [a] ... constitutional provision by the District Court, even though they would not be directly bound by such a determination." Franklin v. Massachusetts, 505 U.S. 788, 803, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (plurality opinion); see also Utah v. Evans, 536 U.S. 452, 463-64, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002).[12] This substantial likelihood, though not a mathematical certainty, is more than sufficient to establish the redressability of plaintiffs' injuries.[13]
D. The Knight Institute's Organizational Standing
"Under [the] theory of 'organizational' standing, the organization is just another person-albeit a legal person-seeking to vindicate a right." N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012).[14] When organizations "sue on their own behalf, they must independently satisfy the requirements *563 of Article III standing." Knife Rights, Inc. v. Vance, 802 F.3d 377, 388 (2d Cir. 2015) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ). Therefore, the Knight Institute, "as an organization, [bears] the burden of showing: (i) an imminent 'injury in fact' to itself as an organization (rather than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to [the complained-of act]; and (iii) that a favorable decision would redress its injuries." Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quoting Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) ).
Here, the Knight Institute has sufficiently established an injury-in-fact: the infringement of its desire "to read comments that otherwise would have been posted by the blocked Plaintiffs ... in direct reply to @realDonaldTrump tweets." Stip. ¶ 61. This infringement is a cognizable interest for standing purposes, cf. Defs. of Wildlife, 504 U.S. at 562-63, 112 S.Ct. 2130 ("[T]he desire to use or observe ... is undeniably a cognizable interest for purpose of standing"), and the Knight Institute's following of one of the individual plaintiffs establishes that the Knight Institute "would thereby be 'directly' affected apart from" its special interest in the First Amendment, id. at 563, 112 S.Ct. 2130. Contrary to defendants' assertion that the Knight Institute's standing rests on an impermissibly attenuated chain of possibilities, the injury in question is straightforward: first, the individual plaintiffs cannot reply directly to the President's tweets because they have been blocked, Stip. ¶¶ 28, 54, and second, the Knight Foundation possesses a desire to read the direct replies that would have been tweeted, Stip. ¶ 61.
Defendants further contend that the Knight Institute has suffered a noncognizable generalized grievance, but nothing in the record suggests that the citizenry writ large desires to read the individual plaintiffs' tweets engaging with the President's tweets as the Knight Institute does.[15] Even assuming a large number of other individuals share such a desire, that numerosity would not render the Knight Institute's injury a generalized grievance that cannot support Article III standing. See, e.g., Spokeo, 136 S.Ct. at 1548 n.7 ; Massachusetts v. EPA, 549 U.S. at 526 n.24, 127 S.Ct. 1438.
And even assuming arguendo that the Knight Institute's assertion of its desire to view the individual plaintiffs' tweets standing alone is insufficient to support standing, see, e.g., Defs. of Wildlife, 504 U.S. at 562-64, 112 S.Ct. 2130 ; Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 886-89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), any insufficiency is remedied by the fact that the Knight Institute did and does follow one of the individual plaintiffs, Stip. ¶ 62. Defendants correctly note that the Knight Institute did not follow on Twitter six of the seven individual plaintiffs' accounts (as of one month after this lawsuit was filed), Stip. ¶ 62, but the Knight Institute's following of one of the individual plaintiffs is significant and represents "dispositively more than the mere 'general averments' and 'conclusory allegations' found inadequate in National Wildlife Federation," Laidlaw, 528 U.S. at 184, 120 S.Ct. 693 (citing Nat'l Wildlife Fed'n, 497 U.S. at 888, 110 S.Ct. 3177 ), and comparable cases. We therefore conclude that the Knight Institute has established an injury-in-fact necessary to support its organizational standing.
*564 The causation and redressability elements of standing are also satisfied as to the Knight Institute. The causation analysis as to the Knight Institute largely follows that applicable to the individual plaintiffs: the Knight Institute's injury-the inability to read the individual plaintiffs' direct replies to the President's tweets-is a direct consequence of the individual plaintiffs being unable to reply directly to the President's tweets, which is, in turn, a direct consequence of the individual plaintiffs having been blocked. Stip. ¶¶ 28, 54, 59, 61. The Knight Institute's injuries are similarly redressable-if the individual plaintiffs were unblocked, they would be able to tweet direct replies to tweets sent by @realDonaldTrump and the Knight Institute would again be able to fulfill its desire to read those direct replies. While the individual plaintiffs would need to choose to reply in order for the Knight Institute to read a reply, certain individual plaintiffs' attempts to circumvent blocking's limitation on direct replies, Stip. ¶ 59, and the individual plaintiffs' identification of the burdens posed by blocking as prompting their reduced engagement, Stip. ¶ 60, strongly suggests that at least some of the individual plaintiffs are likely to reply if they were to have the capacity to do so. Accordingly, we conclude that the Knight Institute also has standing.
III. First Amendment
Concluding that the individual plaintiffs and the Knight Institute both have standing to sue Scavino and the President, we turn to the First Amendment's application to the distinctly twenty-first century medium of Twitter. The primary point of dispute between the parties is whether a public official's blocking of the individual plaintiffs on Twitter implicates a forum for First Amendment purposes. Our analysis of this question proceeds in several steps.
"[W]e must first decide whether" the speech in which the individual plaintiffs seek to engage "is speech protected by the First Amendment." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ; see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee (ISKCON ), 505 U.S. 672, 677, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). A conclusion that individual plaintiffs' speech is protected speech, however, "merely begins our inquiry." Cornelius, 473 U.S. at 799, 105 S.Ct. 3439. We must then assess whether the putative forum is susceptible to forum analysis at all, see Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) ("Other government properties are ... not fora at all."); see also Pleasant Grove City, 555 U.S. at 480, 129 S.Ct. 1125 (identifying when "forum analysis is out of place"), identifying with particularity the putative forum at issue, see Cornelius, 473 U.S. at 800, 105 S.Ct. 3439. If so, we must then determine its classification. Id. ("Having defined the relevant forum, we must then determine whether it is public or nonpublic in nature.").[16] To the extent we conclude that a First Amendment forum is implicated, we consider whether "the extent to which the Government [has] control[led] access" is consistent with the class of forum identified. Id.
A. Protected Speech
Our inquiry into whether the speech at issue is protected by the First Amendment is straightforward. The individual plaintiffs seek to engage in political *565 speech, Stip. ¶¶ 46-52, and such "speech on matters of public concern" "fall within the core of First Amendment protection," Engquist v. Ore. Dep't of Agric., 553 U.S. 591, 600, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008). Indeed, there is no suggestion that the speech in which the individual plaintiffs engaged and seek to engage fall within the "well-defined and narrowly limited classes of speech," such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, "the prevention and punishment of which have never been thought to raise any Constitutional problem." Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 791, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ); see also United States v. Stevens, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). We readily conclude the speech in which individual plaintiffs seek to engage is protected speech.
B. Applicability of Forum Doctrine
We turn next to the applicability of forum doctrine. As a threshold matter, for a space to be susceptible to forum analysis, it must be owned or controlled by the government. See, e.g., Cornelius, 473 U.S. at 801, 105 S.Ct. 3439 ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns."). Further, the application of forum doctrine must be consistent with the purpose, structure, and intended use of the space. See, e.g., Pleasant Grove City, 555 U.S. at 480, 129 S.Ct. 1125 ("[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place.").
The Supreme Court has instructed that in determining whether these requirements are satisfied (i.e., whether forum analysis can be appropriately applied), we should identify the putative forum by "focus[ing] on the access sought by the speaker." Cornelius, 473 U.S. at 801, 105 S.Ct. 3439 ; see Lebron v. Nat'l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 655 (2d Cir. 1995). "When speakers seek general access to public property, the forum encompasses that property." Cornelius, 473 U.S. at 801, 105 S.Ct. 3439. By contrast, "[i]n cases in which limited access is sought, [the Supreme Court's] cases have taken a more tailored approach to ascertaining the perimeters of a forum." Id. For example, in Cornelius, where plaintiffs sought access to a fundraising drive conducted in the federal workplace, the fundraising drive specifically, rather than the federal workplace generally, constituted the would-be forum. Id. Similarly, in Perry Education Ass'n v. Perry Local Educators' Ass'n, where the plaintiff sought access to a public school's internal mail system in order to distribute literature, the mail system rather than the school was the space in question. 460 U.S. 37, 46-47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). And in Lehman v. City of Shaker Heights, where the plaintiff sought access to advertising space on the side of city buses, the advertising space and not the buses constituted the putative forum. 418 U.S. 298, 300-01, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). Indeed, this exercise in carefully delineating the putative forum based on the access sought is not an academic one. For instance, a public park is susceptible to forum analysis when "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. 948 (quoting Hague v. Comm. for Indus. Org., 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.) ), but the same public park is not when "the installation of permanent monuments" is concerned, Pleasant Grove City, 555 U.S. at 480, 129 S.Ct. 1125.
*566 We can therefore reject, at the outset, any contention that the @realDonaldTrump account as a whole is the would-be forum to be analyzed. Plaintiffs do not seek access to the account as a whole-they do not desire the ability to send tweets as the President, the ability to receive notifications that the President would receive, or the ability to decide who the President follows on Twitter. Because the access they seek is far narrower, we consider whether forum doctrine can be appropriately applied to several aspects of the @realDonaldTrump account rather than the account as a whole: the content of the tweets sent, the timeline comprised of those tweets, the comment threads initiated by each of those tweets, and the "interactive space" associated with each tweet in which other users may directly interact with the content of the tweets by, for example, replying to, retweeting, or liking the tweet.
1. Government Ownership or Control
First, to potentially qualify as a forum, the space in question must be owned or controlled by the government. While the Supreme Court has frequently referred to "government-owned property," e.g., Pleasant Grove City, 555 U.S. at 478, 129 S.Ct. 1125 ; see also ISKCON, 505 U.S. at 678, 112 S.Ct. 2701 (referring to property that the government "owns and controls"), its precedents have also made clear that a space may be a forum based on government control even absent legal ownership, see, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez, 561 U.S. 661, 679, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010) ("[T]his Court has employed forum analysis to determine when a governmental entity, in regulating property in its charge, may place limitations on speech." (emphasis added) ); Cornelius, 473 U.S. at 801, 105 S.Ct. 3439 ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns." (emphasis added) ); Perry Educ. Ass'n, 460 U.S. at 46, 103 S.Ct. 948 ("[T]he 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' " (emphasis added) (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 130, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) ) ); see also Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (concluding that a "privately owned ... theater under long-term lease to the city," id. at 547, 95 S.Ct. 1239, was a public forum, id. at 555, 95 S.Ct. 1239 ). This requirement of governmental control, rather than complete governmental ownership, is not only consistent with forum analysis's focus on "the extent to which the Government can control access" to the space and whether that control comports with the First Amendment, Cornelius, 473 U.S. at 800, 105 S.Ct. 3439, but also better reflects that a space can be "a forum more in a metaphysical than in a spatial or geographic sense," Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and may "lack[ ] a physical situs," Cornelius, 473 U.S. at 801, 105 S.Ct. 3439, in which case traditional conceptions of "ownership" may fit less well.
Here, the government-control prong of the analysis is met. Though Twitter is a private (though publicly traded) company that is not government-owned, the President and Scavino nonetheless exercise control over various aspects of the @realDonaldTrump account: they control the content of the tweets that are sent from the account and they hold the ability to prevent, through blocking, other Twitter users, including the individual plaintiffs here, from accessing the @realDonaldTrump timeline (while logged into the blocked account) and from participating in the interactive space associated with the *567 tweets sent by the @realDonaldTrump account, Stip. ¶¶ 12, 28-32, 39, 54. Though Twitter also maintains control over the @realDonaldTrump account (and all other Twitter accounts), we nonetheless conclude that the extent to which the President and Scavino can, and do, exercise control over aspects of the @realDonaldTrump account are sufficient to establish the government-control element as to the content of the tweets sent by the @realDonaldTrump account, the timeline compiling those tweets, and the interactive space associated with each of those tweets. While their control does not extend to the content of a retweet or reply when made-"[n]o other Twitter user can alter the content of any retweet or reply, either before or after it is posted" and a user "cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts," Stip. ¶ 26-it nonetheless extends to controlling who has the power to retweet or reply in the first instance.
The President and Scavino's control over the @realDonaldTrump account is also governmental. The record establishes (1) that the @realDonaldTrump account is presented as being "registered to Donald J. Trump, '45th President of the United States of America, Washington, D.C.,' " Stip. ¶ 35; (2) "that the President's tweets from @realDonaldTrump ... are official records that must be preserved under the Presidential Records Act," Stip. ¶ 40; see 44 U.S.C. § 2202 (directing the retention of "Presidential records"; id. § 2201(2) (defining "Presidential records" as those created "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President"); and (3) that the @realDonaldTrump account has been used in the course of the appointment of officers (including cabinet secretaries), the removal of officers, and the conduct of foreign policy, Stip. ¶ 38-all of which are squarely executive functions, see U.S. Const. art. II, § 2, cl. 2 (appointments); Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 492-93, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (relating the President's removal power to "his responsibility to take care that the laws be faithfully executed" under Article II, section 3, clause 5 of the Constitution (emphasis omitted) ); Zivotofsky ex rel. Zivotofsky v. Kerry, --- U.S. ----, 135 S.Ct. 2076, 2090, 192 L.Ed.2d 83 (2015) ("The President does have a unique role in communicating with foreign governments ...."). That is, the President presents the @realDonaldTrump account as being a presidential account as opposed to a personal account and, more importantly, uses the account to take actions that can be taken only by the President as President. Accordingly, we conclude that the control that the President and Scavino exercise over the account and certain of its features is governmental in nature.
Defendants contend that the governmental control-or-ownership prong is not met because we must also analyze the specific action in question-blocking-under the "under color of state law" precedents developed in the context of actions against state officials under 42 U.S.C. § 1983. In that context, the standards for whether an action was taken "under color of state law" and for whether an action constitutes "state action" are identical, see Lugar v. Edmondson Oil Co., 457 U.S. 922, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), and an official takes action under color of state law when he "exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) ). Invoking *568 this standard, defendants contend that the act of blocking is not state action triggering First Amendment scrutiny because blocking is a functionality made available to every Twitter user, Stip. ¶ 28, and is therefore not a power possessed by virtue of state law.
While the Constitution applies only to the government and not private individuals, the requirement of state action in the forum context is not usually analyzed separately (either in general or under the West standard specifically) from the government control-or-ownership requirement. As the Second Circuit has recently explained, "[b]ecause facilities or locations deemed to be public forums are usually operated by governments, determining that a particular facility or location is a public forum usually suffices to render the challenged action taken there to be state action subject to First Amendment limitations." Halleck v. Manhattan Cmty. Access Corp., 882 F.3d 300, 306-07 (2d Cir. 2018) (citing Widmar v. Vincent, 454 U.S. 263, 265-68, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and City of Madison, Joint Sch. Dist. No. 8 v. Wisc. Emp't Relations Comm'n, 429 U.S. 167, 169-76, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) ). While further analysis may be necessary when the party exercising control over the forum is a nongovernmental entity, see, e.g., id. at 307, in which case consideration of the factors set forth by the Supreme Court in Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 295-96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), may be appropriate, the Brentwood factors are a poor fit for the facts of this case: the parties exercising control here are a public official, the President, and his subordinate, Scavino, acting in his official capacity.[17]
Further, this argument, which focuses on the act of exclusion divorced from the context of the space from which a person is being excluded, proves too much and is difficult to reconcile with the Supreme Court's public forum precedents. Defendants correctly argue that blocking is a capability held by every Twitter user, Stip. ¶ 28, but the power to exclude is also one afforded generally to every property owner. When a government acts to "legally preserve the property under its control for the use to which it is dedicated," it behaves "like the private owner of property." Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510 ; Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 390, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) ; see also, e.g., Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) ("The State, no less than a private owner of property, has the power to preserve the property under its control ...."). Indeed, when the government exercises its "right to exclude others from entering and using *569 [its] property," Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), it is deploying "one of the most essential sticks in the bundle of rights that are commonly characterized as property," Dolan v. City of Tigard, 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). The right to exclude is "perhaps the most fundamental of all property interests," Lingle, 544 U.S. at 539, 125 S.Ct. 2074, and it is one shared by the government and private property owners alike. The context of the property from which the government is excluding, therefore, must factor into the analysis. No one can seriously contend that a public official's blocking of a constituent from her purely personal Twitter account-one that she does not impress with the trappings of her office and does not use to exercise the authority of her position-would implicate forum analysis, but those are hardly the facts of this case.
For the same reason, defendants' reliance on the President's establishment of the account in 2009, Stip. ¶ 32-well before his election and inauguration as President-is unpersuasive. To the extent forum analysis applies, "[t]he past history of characterization of a forum may well be relevant; but that does not mean a present characterization about a forum may be disregarded." Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 77 (1st Cir. 2004) ; see Make the Rd. by Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004) (recognizing that certain First Amendment restrictions apply "so long as a forum remains public"); cf. Bronx Household of Faith v. Bd. of Educ., 650 F.3d 30, 41 (2d Cir. 2011) (reasoning that "the nature of the site changes" depending on how the site is being used). The Supreme Court has expressly held that "a state is not required to indefinitely retain the open character of the facility," e.g., Perry Educ. Ass'n, 460 U.S. at 46, 103 S.Ct. 948, but changes need not be one-directional. Indeed, the entire concept of a designated public forum rests on the premise that the nature of a (previously closed) space has been changed. See, e.g., Cornelius, 473 U.S. at 802, 105 S.Ct. 3439.
To take two examples, if a facility initially developed by the government as a military base-plainly not a public forum under Greer, 424 U.S. at 838, 96 S.Ct. 1211 -is subsequently decommissioned and repurposed into a public park,[18] the present use of the facility as a park would bear much more heavily on the forum analysis than its historical origins as a military installation. Similarly, if a privately constructed airport were subsequently taken over by a public agency, forum analysis would focus on its current use as a public airport rather than its prior use as a private one. Cf. ISKCON, 505 U.S. at 681, 112 S.Ct. 2701 ("The practices of privately held transportation centers do not bear on the government's regulatory authority over a publicly owned airport.").
Here, the President and Scavino's present use of the @realDonaldTrump account weighs far more heavily in the analysis than the origin of the account as the creation of private citizen Donald Trump. That latter fact cannot be given the dispositive weight that defendants would ascribe to it. Rather, because the President and Scavino use the @realDonaldTrump account for governmental functions, the control they exercise over it is accordingly governmental in nature.
That control, however, does not extend to the comment thread initiated by *570 a tweet sent by the @realDonaldTrump account. The comment thread-consisting of the initial tweet, direct replies to that tweet, and second-order (and higher-order) replies to those replies-therefore cannot be a putative forum. While the President and Scavino can control the interactive space by limiting who may directly reply or retweet a tweet initially sent by the @realDonaldTrump account, they lack comparable control over the subsequent dialogue in the comment thread. As plaintiffs acknowledge, even the individual plaintiffs who have been blocked "can view replies to @realDonaldTrump tweets, and can post replies to those replies, while logged in to the blocked accounts," and that these "[r]eplies-to-replies appear in the comment threads that originate with @realDonaldTrump tweets." Stip. ¶ 57. Because a Twitter user lacks control over the comment thread beyond the control exercised over first-order replies through blocking, the comment threads-as distinguished from the content of tweets sent by @realDonaldTrump, the @realDonaldTrump timeline, and the interactive space associated with each tweet-do not meet the threshold criterion for being a forum.
2. Purpose, Structure, and Intended Use
We next assess whether application of forum analysis is consistent with the purpose, structure, and intended use of the three aspects of the @realDonaldTrump account that we have found to satisfy the government control-or-ownership criterion: specifically, the content of tweets, the timeline comprised of the account's tweets, and the interactive space of each tweet.
Generally, "[t]he forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." Pleasant Grove City, 555 U.S. at 478, 129 S.Ct. 1125. By contrast, forum analysis is not appropriately applied when "the government has broad discretion to make content-based judgments in deciding what private speech to make available to the public." United States v. Am. Library Ass'n, 539 U.S. 194, 204, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (plurality opinion). For example, the Supreme Court has held that "[w]hen a public broadcaster exercises editorial discretion in the selection and presentation of its programming," its decisions are not subject to forum analysis. Forbes, 523 U.S. at 674, 118 S.Ct. 1633. Forum analysis was inappropriate, the Court reasoned, because "[c]laims of access under [the Court's] public forum precedents could obstruct the legitimate purposes of television broadcasters." Id."[B]road rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise to fulfill their journalistic purpose and statutory obligations." Id. at 673, 118 S.Ct. 1633. Similarly, the Supreme Court has declined to apply forum analysis to a grant program operated by the National Endowment for the Arts (NEA), reasoning that "[t]he NEA's mandate is to make esthetic judgments" and the application of an "inherently content-based 'excellence' threshold for NEA support." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 586, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). And applying Forbes and Finley, a four-Justice plurality of the Supreme Court concluded that the internet access provided by public libraries was not susceptible to forum analysis, as forum analysis was "incompatible with the discretion that public libraries must have to fulfill their traditional missions," which involve the "exercise of judgment in selecting the material [the library] provides to its patrons."
*571 Am. Library Ass'n, 539 U.S. at 205, 123 S.Ct. 2297 (plurality opinion).[19] Ultimately, "where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." Pleasant Grove City, 555 U.S. at 480, 129 S.Ct. 1125.
Government speech is one category of speech that falls outside the domain of forum analysis: when the government "is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply." Walker v. Tex. Div., Sons of Confederate Veterans, Inc., --- U.S. ----, 135 S.Ct. 2239, 2250, 192 L.Ed.2d 274 (2015). "The Free Speech Clause restricts [only] government regulation of private speech; it does not regulate government speech." Pleasant Grove City, 555 U.S. at 467, 129 S.Ct. 1125.
However, "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." Id. at 470, 129 S.Ct. 1125. Private involvement in the formulation of the speech in question does not preclude the conclusion that it is government speech. For example, Pleasant Grove City concluded that monuments that were privately financed but subsequently accepted by a municipal government and displayed on public park land was government speech, see id. at 470-71, 129 S.Ct. 1125, and Walker held that specialty license plate designs proposed by private groups but approved and issued by a state department of motor vehicles was also government speech, see 135 S.Ct. at 2248-50. Conversely, "speech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some way allows or facilitates it." Wandering Dago, Inc. v. Destito, 879 F.3d 20, 34 (2d Cir. 2018) (citing Cornelius, 473 U.S. at 811-13, 105 S.Ct. 3439 ).
In assessing whether speech constitutes government speech as opposed to private speech, the Supreme Court has considered at least three factors: whether government has historically used the speech in question "to convey state messages," whether that speech is "often closely identified in the public mind" with the government, and the extent to which government "maintain[s] direct control over the messages conveyed," with Walker's application of these factors "likely mark[ing] the outer bounds of the government-speech doctrine." Matal v. Tam, --- U.S. ----, 137 S.Ct. 1744, 1760, 198 L.Ed.2d 366 (2017) (quoting Walker, 135 S.Ct. at 2246-49 ); see also Wandering Dago, 879 F.3d at 34 (distilling the same three factors from Walker ).
Based on the government speech doctrine, we reject out of hand any contention that the content of the President's tweets are susceptible to forum analysis. It is not so susceptible because the content is government speech: the record establishes that the President, sometimes "[w]ith the assistance of Mr. Scavino," uses the content of his tweets "to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; to challenge media organizations whose coverage of his Administration he believes to be unfair; and for other statements, including on occasion statements unrelated to official government business." Stip. ¶ 38. Indeed, the content of the tweets sent by @realDonaldTrump are solely the speech of the President or of other government officials. Stip. ¶ 39.[20] For *572 the same reason, the account's timeline, which "displays all tweets generated by the [account]" is not susceptible to forum analysis: the timeline merely aggregates the content of all of the account's tweets, Stip. ¶ 15, all of which is government speech.
The same cannot be said, however, of the interactive space for replies and retweets created by each tweet sent by the @realDonaldTrump account. At minimum, as to replies, they are most directly associated with the replying user rather than the sender of the tweet being replied to: a reply tweet appears with the picture, name, and handle of the replying user, Stip. ¶¶ 23, 57, and appears most prominently in the timeline of the replying user, Stip. ¶ 22. Replying tweets are "controlled by the user who generates them," and "[n]o other Twitter user can alter the content of any ... reply, either before or after it is posted." Stip. ¶ 26. Given the prominence with which the account information of the replying user is displayed in the replying tweet, the reply is unlikely to be "closely identified in the public mind" with the sender, even when the sender of the tweet being replied to is a governmental one. Matal, 137 S.Ct. at 1760 ; Walker, 135 S.Ct. at 2248. And, far from "maintain[ing] direct control over the messages conveyed" in a user's replies to the President's tweets (assuming the user retains the ability to reply, i.e., the user has not been blocked), the government maintains no control over the content of the reply. Matal, 137 S.Ct. at 1760 ; Walker, 135 S.Ct. at 2249. Taken together, these factors support the conclusion that replies to the President's tweets remain the private speech of the replying user. The association that a reply has with a governmental sender of the tweet being replied to-the indication that the replying tweet is a reply and its appearance in the comment thread accessed from the timeline of the governmental sender-is not sufficient to render the reply government speech.[21]
Nor is the interactive space of each tweet, as distinguished from the content of the tweet, constrained by the notions of inherent selectivity and scarcity that the Supreme Court held to counsel against the application of forum doctrine in Finley and Forbes and in Pleasant Grove City, respectively. Generally, no selection is involved in determining who has the ability to interact directly with the President's tweets: the @realDonaldTrump account is "generally accessible to the public at large without regard to political affiliation or any other limiting criteria," such that any Twitter user who has not been blocked may so engage. Stip. ¶ 36. Indeed, just as "a park can accommodate many speakers and, over time, many parades and demonstrations"; "[t]he Combined Federal Campaign permits hundreds of groups to solicit donations from federal employees" as in *573 Cornelius; "[a] public university's student activity fund can provide money for many campus activities" as in Rosenberger; "a public university's buildings may offer meeting space for hundreds of student groups" as in Widmar; and "[a] school system's internal mail facilities can support the transmission of many messages to and from teachers and school administrators" as in Perry Education Ass'n, Pleasant Grove City, 555 U.S. at 478, 129 S.Ct. 1125, the interactive space of a tweet can accommodate an unlimited number of replies and retweets. Indeed, the record establishes that tweets sent by the @realDonaldTrump account regularly attract tens of thousands, if not hundreds of thousands, of replies and retweets, Stip. ¶¶ 41-43, and nothing suggests that the "application of forum analysis" to the interactive space associated with a tweet "would lead almost inexorably to closing of the forum," id. at 480, 129 S.Ct. 1125. Rather, the interactive space is "capable of accommodating a large number of public speakers without defeating [its] essential function," id. at 478, 129 S.Ct. 1125 ; and indeed, the essential function of a given tweet's interactive space is to allow private speakers to engage with the content of the tweet, Stip. ¶ 13, which supports the application of forum analysis.
Ultimately, the delineation of a tweet's interactive space as the putative forum is consistent with the Supreme Court's directive to "focus[ ] on the access sought by the speaker." Cornelius, 473 U.S. at 801, 105 S.Ct. 3439. When a user is blocked, the most significant impediment is the ability to directly interact with a tweet sent by the blocking user. While a blocked user is also limited in that the user may not view the content of the blocking user's tweets or view the blocking user's timeline, those limitations may be circumvented entirely by "using an internet browser or other application that is not logged in to Twitter, or that is logged in to a Twitter account that is not blocked." Stip. ¶ 55. By contrast, the ability to interact directly cannot be completely reestablished, Stip. ¶¶ 54, 58-59, and that ability-i.e., access to the interactive space-is therefore best described as the access that the individual plaintiffs seek.
In sum, we conclude that the interactive space associated with each of the President's tweets is not government speech and is properly analyzed under the Supreme Court's forum precedents.
C. Classification
Having concluded that forum analysis is appropriately applied to the interactive space associated with a tweet, we turn to the question of classification. "The Supreme Court has recognized three types of fora across a spectrum of constitutional protection for expressive activity." Make the Rd., 378 F.3d at 142. First, traditional public fora are "places which by long tradition or by government fiat have been devoted to assembly and debate." Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. 948. These spaces, like streets and parks, "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Id. (quoting Hague, 307 U.S. at 515, 59 S.Ct. 954 (opinion of Roberts, J.) ). Absent a well-established history of dedication to public use, however, a forum cannot be a traditional public forum. The Supreme Court has "rejected the view that traditional public forum status extends beyond its historic confines." Forbes, 523 U.S. at 678, 118 S.Ct. 1633 (citing ISKCON, 505 U.S. at 680-81, 112 S.Ct. 2701 ).
"A second category consists of public property which the state has opened for use by the public as a place for expressive activity."
*574 Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. 948. "To create a forum of this type, the government must intend to make the property 'generally available,' to a class of speakers." Forbes, 523 U.S. at 678, 118 S.Ct. 1633 (citations omitted) (quoting Widmar, 454 U.S. at 264, 102 S.Ct. 269 ). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse," and we "look[ ] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. Finally, a space that is susceptible to forum analysis but is "not by tradition or designation a forum for public communication," Perry Educ. Ass'n, 460 U.S. at 46, 103 S.Ct. 948, is termed a "nonpublic forum," Forbes, 523 U.S. at 677, 118 S.Ct. 1633.
Applying this three-part classification framework to the interactive space, we can first conclude that the interactive space of a tweet sent by @realDonaldTrump is not a traditional public forum. There is no historical practice of the interactive space of a tweet being used for public speech and debate since time immemorial, for there is simply no extended historical practice as to the medium of Twitter. While the Supreme Court has referenced the "vast democratic forums of the Internet," Reno v. ACLU, 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), has described the internet (including social media platforms such as Twitter) as one of "the most important places (in a spatial sense) for the exchange of views," Packingham v. North Carolina, --- U.S. ----, 137 S.Ct. 1730, 1735, 198 L.Ed.2d 273 (2017), and has analogized the internet to the "essential venues for public gatherings" of streets and parks, id., the lack of historical practice is dispositive, see Forbes, 523 U.S. at 678, 118 S.Ct. 1633.
Accordingly, we consider whether the interactive space is a designated public forum, with "governmental intent" serving as "the touchstone for determining whether a public forum has been created." Gen. Media Commc'ns, Inc. v. Cohen, 131 F.3d 273, 279 (2d Cir. 1997). "Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: [the government's] policy and past practice, as well as the nature of the property and its compatibility with expressive activity." Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir. 1991) (citing Cornelius, 473 U.S. at 802-03, 105 S.Ct. 3439 ).
Here, these factors strongly support the conclusion that the interactive space is a designated public forum. "The @realDonaldTrump account is generally accessible to the public at large without regard to political affiliation or any other limiting criteria," "any member of the public can view his tweets," and "anyone [with a Twitter account] who wants to follow the account [on Twitter] can do so," unless that person has been blocked. Stip. ¶ 36. Similarly, anyone with a Twitter account who has not been blocked may participate in the interactive space by replying or retweeting the President's tweets. Stip. ¶¶ 21, 22, 28, 36. Further, the account-including all of its constituent components-has been held out by Scavino as a means through which the President "communicates directly with you, the American people!" Stip. ¶ 37 (alterations incorporated). And finally, there can be no serious suggestion that the interactive space is incompatible with expressive activity: rather, Twitter as a platform is designed to allow users "to interact with other Twitter users in relation to [their tweets]," Stip. ¶ 13, and users can use Twitter to "petition their elected representatives and otherwise engage with them in a direct manner,"
*575 Packingham, 137 S.Ct. at 1735. The interactivity of Twitter is one of its defining characteristics, and indeed, the interactive space of the President's tweets accommodates a substantial body of expressive activity. Stip. ¶¶ 41-43. Taking these factors together, we conclude that the interactive space of a tweet from the @realDonaldTrump account constitutes a designated public forum.
D. Viewpoint Discrimination
"[T]he extent to which the Government can control access depends on the nature of the relevant forum," Cornelius, 473 U.S. at 800, 105 S.Ct. 3439, so we next consider whether the blocking of the individual plaintiffs is permissible in a designated public forum. "Regulation of [a designated public forum] is subject to the same limitations as that governing a traditional public forum"-restriction are permissible "only if they are narrowly drawn to achieve a compelling state interest." ISKCON, 505 U.S. at 678-79, 112 S.Ct. 2701 ; see also Cornelius, 473 U.S. at 800, 105 S.Ct. 3439. Regardless of the specific nature of the forum, however, "[v]iewpoint discrimination ... is presumed impermissible when directed against speech otherwise within the forum's limitations." Rosenberger, 515 U.S. at 830, 115 S.Ct. 2510 ; see also Matal, 137 S.Ct. at 1763 ("When government creates such a forum, in either a literal or 'metaphysical' sense, some content- and speaker-based restrictions may be allowed. However, even in such cases, what we have termed 'viewpoint discrimination' is forbidden." (citations omitted) (quoting Rosenberger, 515 U.S. at 830-31, 115 S.Ct. 2510 ) ).
Here, the individual plaintiffs were indisputably blocked as a result of viewpoint discrimination. The record establishes that "[s]hortly after the Individual Plaintiffs posted the tweets ... in which they criticized the President or his policies, the President blocked each of the Individual Plaintiffs," Stip. ¶ 53, and defendants do "not contest Plaintiffs' allegation that the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies." Stip. at 1. The continued exclusion of the individual plaintiffs based on viewpoint is, therefore, impermissible under the First Amendment.[22]
Defendants contend that the blocking of the individual plaintiffs is permissible because the President retains a personal First Amendment interest in choosing the people with whom he associates and retains the right not to engage with (i.e., the right to ignore) the individual plaintiffs. Further, they argue, the individual plaintiffs have no right to be heard by a government audience and no right to have their views amplified by the government. While those propositions are accurate as statements of law, they nonetheless do not render the blocking of the individual plaintiffs constitutionally permissible.
To be clear, a public official does not lose his First Amendment rights upon taking office. Cf.
*576 Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). "The interest of the public in hearing all sides of a public issue," an interest that the First Amendment seeks to protect, "is hardly advanced by extending more protection to citizen-critics than to [public officials]." Bond v. Floyd, 385 U.S. 116, 136, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). That is, no set of plaintiffs could credibly argue that they "have a constitutional right to prevent [government officials] from exercising their own rights" under the First Amendment. X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 70 (2d Cir. 1999). Further, "[n]othing in the First Amendment or in [the Supreme] Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." Minn. State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 285, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984). No First Amendment harm arises when a government's "challenged conduct is simply to ignore the [speaker]," as the Supreme Court has affirmed that "[t]hat it is free to do." Smith v. Ark. State Highway Emps., Local 1315, 441 U.S. 463, 466, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam). Stated otherwise, "[a] person's right to speak is not infringed when government simply ignores that person while listening to others," or when the government "amplifies" the voice of one speaker over those of others. Minn. State Bd., 465 U.S. at 288, 104 S.Ct. 1058. Nonetheless, when the government goes beyond merely amplifying certain speakers' voices and not engaging with others, and actively restricts "the right of an individual to speak freely [and] to advocate ideas," it treads into territory proscribed by the First Amendment. Id. at 286, 104 S.Ct. 1058 (quoting Smith, 441 U.S. at 464, 99 S.Ct. 1826 ).
Consideration of Twitter's two features for limiting interaction between users-muting and blocking-is useful in addressing the potentially conflicting constitutional prerogatives of the government as listener on the one hand and of speakers on the other, as muting and blocking differ in relevant ways. As Twitter explains, "[m]ut[ing] is a feature that allows [a user] to remove an account's Tweets from [the user's] timeline without unfollowing or blocking that account." How to Mute. For muted accounts that the muting account does not follow on Twitter, "[r]eplies and mentions will not appear" in the muting account's notifications, nor will mentions by the muted account. Id. That is, muting allows a user to ignore an account with which the user does not wish to engage. The muted account may still attempt to engage with the muting account-it may still reply to tweets sent by the muting account, among other capabilities-but the muting account generally will not see these replies.[23] Critically, however, the muted account may still reply directly to the muting account, even if that reply is ultimately ignored.
Blocking, by contrast, goes further. The blocking user "will not see any tweets posted by the blocked user" just as a muting user would not see tweets posted by a muted user, but whereas muting preserves the muted account's ability to reply to a tweet sent by the muting account, blocking precludes the blocked user from "see[ing] or reply[ing] to the blocking user's tweets" entirely. Stip. ¶ 28. The elimination of the blocked user's ability to reply directly is more than the blocking user merely ignoring the blocked user; it is *577 the blocking user limiting the blocked user's right to speak in a discrete, measurable way. Muting equally vindicates the President's right to ignore certain speakers and to selectively amplify the voices of certain others but-unlike blocking-does so without restricting the right of the ignored to speak.
Given these differing consequences of muting and blocking, we find unpersuasive defendants' contention that a public official's muting and blocking are equivalent, and equally constitutional, means of choosing not to engage with his constituents. Implicit in this argument is the assumption that a reply to a tweet is directed only at the user who sent the tweet being replied to. Were that so, defendants would be correct in that there is no difference between the inability to send a direct reply (as with blocking) and the inability to have that direct reply heard by the sender of the initial tweet being responded to (as with muting). But this assumption is not supported in the record: a reply is visible to others, Stip. ¶ 22, and may itself be replied to by other users, Stip. ¶¶ 57-58. The audience for a reply extends more broadly than the sender of the tweet being replied to, and blocking restricts the ability of a blocked user to speak to that audience. While the right to speak and the right to be heard may be functionally identical if the speech is directed at only one listener, they are not when there is more than one.
In sum, we conclude that the blocking of the individual plaintiffs as a result of the political views they have expressed is impermissible under the First Amendment. While we must recognize, and are sensitive to, the President's personal First Amendment rights, he cannot exercise those rights in a way that infringes the corresponding First Amendment rights of those who have criticized him.
To be sure, we do not suggest that the impact on the individual plaintiffs (and, by extension, on the Knight Institute) is of the highest magnitude. It is not. But the law is also clear: the First Amendment recognizes, and protects against, even de minimis harms. See Six Star Holdings, LLC v. City of Milwaukee, 821 F.3d 795, 805 (7th Cir. 2016) (rejecting an argument of "de minimis" First Amendment harm and approving an award of nominal damages); Lippoldt v. Cole, 468 F.3d 1204, 1221 (10th Cir. 2006) (similar); KH Outdoor, LLC v. City of Trussville, 465 F.3d 1256, 1261 (11th Cir. 2006) (similar); Risdal v. Halford, 209 F.3d 1071, 1072 (8th Cir. 2000) (similar); cf. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (same). Thus, even though defendants are entirely correct in contending that the individual plaintiffs may continue to access the content of the President's tweets, Stip. ¶¶ 55-56, and that they may tweet replies to earlier replies to the President's tweets, Stip. ¶¶ 57-58, the blocking of the individual plaintiffs has the discrete impact of preventing them from interacting directly with the President's tweets, Stip. ¶ 54, thereby restricting a real, albeit narrow, slice of speech. No more is needed to violate the Constitution.
IV. Relief
As plaintiffs seek both injunctive and declaratory relief, we turn, then, to the question of the proper remedy to be afforded here.[24] Defendants suggest that *578 we categorically lack authority to enjoin the President, a proposition we do not accept. Stated simply, "separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." Nixon v. Fitzgerald, 457 U.S. 731, 753-54, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982). Rather, "it is ... settled that the President is subject to judicial process in appropriate circumstances," Clinton v. Jones, 520 U.S. 681, 703, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), and the Supreme Court has expressly rejected the notion of "an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances," id. at 704, 117 S.Ct. 1636 (quoting United States v. Nixon, 418 U.S. 683, 706, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ).
However, "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." Nixon v. Fitzgerald, 457 U.S. at 754, 102 S.Ct. 2690. A four-Justice plurality of the Supreme Court has explained that while "in general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,' " Mississippi v. Johnson, 71 U.S. (4 Wall). 475, 499, 18 L.Ed. 437 (1866), "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." Franklin, 505 U.S. at 802-03, 112 S.Ct. 2767 (plurality opinion) (quoting Mississippi v. Johnson, 71 U.S. (4 Wall) at 499 ). Franklin's acknowledgment of the door left open by Mississippi v. Johnson is consistent with the balancing approach articulated by the Court in Nixon v. Fitzgerald: an injunction directing the performance of a ministerial duty represents a minimal "danger[ ] of intrusion on the authority and functions of the Executive Branch" as compared to imposition posed by the injunction considered in Mississippi v. Johnson.
In this case, the intrusion on executive prerogative presented by an injunction directing the unblocking of the individual plaintiffs would be minimal. Any such injunction would not direct the President to execute the laws in a certain way, nor would it mandate that he pursue any substantive policy ends. Even accepting that the President's blocking decisions in the first instance are discretionary, the duty to unblock-following a holding that such blocking was unconstitutional-would not be, as the President must act in compliance with the Constitution and other laws. Cf. Swan, 100 F.3d at 977 ("[The asserted statutory] duty, if it exists, is ministerial and not discretionary, for the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes."). That is, the correction of an unconstitutional act far more closely resembles the performance of "a mere ministerial duty," where "nothing [is] left to discretion," than the performance of a "purely executive and political" duty requiring the exercise of discretion vested in the President. Mississippi v. Johnson, 71 U.S. (4 Wall) at 499. An injunction directing the unblocking of the individual plaintiffs would therefore impose a duty that far more closely resembles the duties considered in Swan, see 100 F.3d at 977-78, and in *579 National Treasury Employees Union v. Nixon, 492 F.2d 587, 608 (D.C. Cir. 1974) (defining a "ministerial duty" as "a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law"), than the highly discretionary duty considered in Mississippi v. Johnson. The ways to faithfully execute the Reconstruction Acts passed by Congress following the Civil War are uncountable in number, but "[t]he law require[s] the performance of a single specific act" here. Mississippi v. Johnson, 71 U.S. (4 Wall) at 499. No government official, after all, possesses the discretion to act unconstitutionally.
We need not, however, ultimately resolve the question of whether injunctive relief may be awarded against the President, as injunctive relief directed at Scavino and declaratory relief remain available. While we find entirely unpersuasive the Government's parade of horribles regarding the judicial interference in executive affairs presented by an injunction directing the President to comply with constitutional restrictions, we nonetheless recognize that "[a]s a matter of comity, courts should normally direct legal process to a lower Executive official even though the effect of the process is to restrain or compel the President." Nixon v. Sirica, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc) (per curiam). Subordinate officials may, of course, be enjoined by the courts. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 584, 588, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (affirming an injunction directed at the Secretary of Commerce); see also, e.g., Int'l Refugee Assistance Project v. Trump, 857 F.3d 554, 605 (4th Cir.) (en banc) (vacating an injunction only to the extent it was directed at the President), vacated and remanded, --- U.S. ----, 138 S.Ct. 353, 199 L.Ed.2d 203 (2017). Injunctive relief directed against Scavino would certainly implicate fewer separation-of-powers concerns, see Franklin, 505 U.S. at 802-03, 112 S.Ct. 2767, but we also recognize that "the strong remedy of injunction," Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 316 (1st Cir. 1992), should be sparingly employed even when those constitutional concerns are not present; see, e.g., Salazar v. Buono, 559 U.S. 700, 714-15, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010) (plurality opinion).
Accordingly, though we conclude that injunctive relief may be awarded in this case-at minimum, against Scavino-we decline to do so at this time because declaratory relief is likely to achieve the same purpose. The Supreme Court has directed that we should "assume it is substantially likely that the President and other executive ... officials would abide by an authoritative interpretation of [a] ... constitutional provision," Franklin, 505 U.S. at 803, 112 S.Ct. 2767 (plurality opinion); see Utah v. Evans, 536 U.S. at 464, 122 S.Ct. 2191 (citing Franklin, 505 U.S. at 803, 112 S.Ct. 2767 (plurality opinion) ); see also Allco Fin. Ltd. v. Klee, 861 F.3d 82, 96 (2d Cir. 2017) ; Made in the USA, 242 F.3d at 1310 ; Swan, 100 F.3d at 980 ; L.A. Cty. Bar Ass'n v. Eu, 979 F.2d 697, 701 (9th Cir. 1992) ("Were this court to issue the requested declaration, we must assume that it is substantially likely that [government officials] ... would abide by our authoritative determination."), and there is simply no reason to depart from this assumption at this time. Declaratory judgment is appropriate under the factors that the Second Circuit directs us to consider, see Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359-60 (2d Cir. 2003), and a declaration will therefore issue: the blocking of the individual plaintiffs from the @realDonaldTrump account because of their expressed political views violates the First Amendment.
"It is emphatically the province and duty of the judicial department to say what the law is,"
*580 Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and we have held that the President's blocking of the individual plaintiffs is unconstitutional under the First Amendment. Because no government official is above the law and because all government officials are presumed to follow the law once the judiciary has said what the law is, we must assume that the President and Scavino will remedy the blocking we have held to be unconstitutional.
V. Conclusion
We conclude that we have jurisdiction to entertain this dispute. Plaintiffs have established legal injuries that are traceable to the conduct of the President and Daniel Scavino and, despite defendants' suggestions to the contrary, their injuries are redressable by a favorable judicial declaration. Plaintiffs lack standing, however, to sue Sarah Huckabee Sanders, who is dismissed as a defendant. Hope Hicks is also dismissed as a defendant, in light of her resignation as White House Communications Director.
Turning to the merits of plaintiffs' First Amendment claim, we hold that the speech in which they seek to engage is protected by the First Amendment and that the President and Scavino exert governmental control over certain aspects of the @realDonaldTrump account, including the interactive space of the tweets sent from the account. That interactive space is susceptible to analysis under the Supreme Court's forum doctrines, and is properly characterized as a designated public forum. The viewpoint-based exclusion of the individual plaintiffs from that designated public forum is proscribed by the First Amendment and cannot be justified by the President's personal First Amendment interests.
In sum, defendants' motion for summary judgment is granted in part and denied in part, and plaintiffs' cross-motion for summary judgment is granted in part and denied in part. The Clerk of the Court is directed to terminate the motions pending at docket entries 34 and 42.
SO ORDERED .

We appreciate the parties' professional response to our suggestion that they stipulate to the underlying facts so that the legal issues presented by this dispute could be addressed without the need to undertake a lengthy discovery process.

At the time of the parties' stipulation, most users were limited to 140 characters per tweet. The limit has since been increased to 280 characters. See Aliza Rosen, Tweeting Made Easier, Twitter (Nov. 7, 2017), https://blog.twitter.com/official/en_us/topics/product/2017/tweetingmadeeasier.html.

The parties agree that we "may take judicial notice of the information published in the 'Using Twitter' and 'Policies and reporting' guides available on Twitter's 'Twitter Support' webpage." Stip. at 3 n.2.

Michael C. Bender & Felicia Schwartz, Rex Tillerson Is out as Secretary of State; Donald Trump Taps Mike Pompeo, Wall St. J. (Mar. 13, 2018, 7:20 P.M.), https://www.wsj.com/articles/rex-tillerson-is-out-as-secretary-of-state-donald-trump-taps-mike-pompeo-1520978116.

Donovan Slack, Veterans Affairs Secretary David Shulkin Is Out, Trump Announces by Tweet, USA Today (Mar. 28, 2018, 8:46 P.M.), https://www.usatoday.com/story/news/politics/2018/03/28/david-shulkin-veterans-affairs-secretary-forced-out-john-kelly/346741002/.

Hicks has since resigned her position as White House Communications Director. See Katie Rogers & Maggie Haberman, Hope Hicks is Gone, and It's Not Clear Who Can Replace Her, N.Y. Times (Mar. 29, 2018), https://www.nytimes.com/2018/03/29/us/politics/hope-hicks-white-house.html. Because plaintiffs seek only prospective relief and Hicks was sued only in her official capacity, Stip. ¶ 10, the fact of Hicks's resignation alone warrants summary judgment in her favor. Further, because the President has not yet appointed Hicks's successor, no substitution by operation of Rule 25(d) can occur. Hicks will therefore be dismissed as a defendant, and no one will be substituted in her stead at this time. The Clerk of the Court is directed to amend the caption of this case accordingly.

The absence of future injury also precludes a finding of redressability, thereby defeating standing to seek injunctive relief on a second basis. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 109, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Because [plaintiff] alleges only past infractions of [law], and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury.").

Further, the Court suggested at oral argument that the parties consider a resolution of this dispute under which the individual plaintiffs would be unblocked and subsequently muted, an approach that would restore the individual plaintiffs' ability to interact directly with (including by replying directly to) tweets from the @realDonaldTrump account while preserving the President's ability to ignore tweets sent by users from whom he does not wish to hear. The fact that no such resolution has been reached further suggests that the individual plaintiffs will continue to be blocked and, consequently, will continue to face the harms of which they complain.

Both parties' reliance on other precedents developed in the context of suits against state officials under 42 U.S.C. § 1983 further persuades us that this line of precedent is applicable here.

Indeed, this passage of Federal Practice and Procedure suggests that a plaintiff asserting a duty claim has standing as long as the claim remains viable, and that the issue of standing becomes irrelevant when the duty is rejected-as the claim will have failed on the merits at that point. The government's argument that plaintiffs lack standing as to Scavino because Scavino has no duty therefore inverts the analysis by resolving the merits before standing. Cf. Steel Co., 523 U.S. at 89, 118 S.Ct. 1003 ("[J]urisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." (omissions in original) (quoting Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ).

Rule 19(a) mandates the joinder of additional persons as parties if "in that person's absence, the court cannot accord complete relief among existing parties," provided that the joinder of that party does "not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19(a)(1)(A). Justice Blackmun, dissenting in Defenders of Wildlife, had contended that the plurality's analysis of redressability rendered superfluous Rule 19's contemplation that the joinder of additional parties would be needed to afford complete relief, as redressability would be lacking as an initial matter. See 504 U.S. at 598 n.4, 112 S.Ct. 2130 (Blackmun, J., dissenting).

This case involves the interpretation of only one law-the First Amendment. The Government's reliance on Delta Construction Co. v. EPA, 783 F.3d 1291 (D.C. Cir. 2015) (per curiam), and Doe v. Cuomo, 755 F.3d 105 (2d Cir. 2014), each of which involved a plaintiff or petitioner subject to the requirements of multiple laws, is accordingly misplaced. In each of those cases, the action that the plaintiff or petitioner sought to undertake would be restricted by the unchallenged law, even if the plaintiff or petitioner were ultimately successful in challenging the first law.

Our conclusion that the individual plaintiffs' injuries are redressable through relief directed at Scavino does not depend on his presence as a defendant. "The power conferred by the [All Writs Act, 28 U.S.C. § 1651,] extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." United States v. N.Y. Tel. Co., 434 U.S. 159, 174, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (citations omitted); see also Made in the USA, 242 F.3d at 1310 n.25 ; Swan, 100 F.3d at 980 ; cf. Fed. R. Civ. P. 65(d)(2) (providing that injunctions and restraining orders bind not only the parties but also their "officers, agents, servants, employees, and attorneys" and "other persons who are in active concert or participation" with those persons). Accordingly, even if Scavino were not a defendant, relief could nonetheless be properly directed at him.

An organizational plaintiff may also have associational standing, under which "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Laidlaw, 528 U.S. at 181, 120 S.Ct. 693. The Knight Institute does not assert that it has standing under an associational standing theory.

We would in fact be highly skeptical of any such contention.

That is, the question of whether a space is susceptible to forum analysis is analytically distinct from the question, assuming that forum analysis applies, of what type of forum (traditional public, designated public, or non-public) the space is.

In Brentwood, the Supreme Court considered whether "a not-for-profit membership corporation organized to regulate interscholastic sport among the public and private high schools" engaged in state action when it enforced its regulations against a member school. 531 U.S. at 291, 121 S.Ct. 924. The Court held that "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself,' " but acknowledged that "[w]hat is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." Id. at 295, 121 S.Ct. 924 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ). After analyzing a number of factors, including (1) whether the private actor was acting pursuant to the state's coercive power, (2) whether the private actor was undertaking a public function, and (3) whether the private actor received significant encouragement from the state or whether its functions were entwined with governmental policies, the Court concluded that state action was present. See id. at 295-96, 121 S.Ct. 924 ; see also Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (analyzing Brentwood ).

Cf. Colo. Dep't of Pub. Health & Env't v. United States, No. 17-cv-2223, 2018 WL 1152264, at *2 (D. Colo. Mar. 5, 2018) (describing the creation of a national wildlife refuge from portions of the Rocky Mountain Arsenal).

Additionally, Justice Breyer agreed that forum analysis was not applicable to the provision of internet access in public libraries. See Am. Library Ass'n, 539 U.S. at 215-16, 123 S.Ct. 2297 (Breyer, J., concurring in the judgment).

Whether the content of retweets initially sent by other users constitutes government speech presents a somewhat closer question. The content of a retweet of a tweet sent by another governmental account, Stip. ¶ 37, is still squarely government speech. The content of the retweet of a tweet sent by a private non-governmental account, Stip. ¶ 39, would still likely be government speech. Despite the private genesis of the content, the act of retweeting by @realDonaldTrump resembles the government's acceptance of the monuments in Pleasant Grove and the government's approval of the license plate designs in Walker, which were sufficient to render the privately originated speech governmental in nature.

Retweets again present a closer question. A retweet appears "in the same form as it did on the original [sender]'s timeline," with the name, picture, and handle of the original sender rather than the retweeter, and with an additional "notation indicating that the post was retweeted" above the tweet in smaller font. Stip. ¶ 21. Nonetheless, in the same way the President's retweeting of a tweet sent by a private individual likely renders the President's retweet government speech, a private individual's retweet of a tweet sent by the President is likely private speech rather than government speech.

Even if the interactive space associated with the content of a tweet constituted a nonpublic forum, the exclusion of the individual plaintiffs would not withstand First Amendment scrutiny. "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806, 105 S.Ct. 3439. The blocking of the individual plaintiffs, which resulted from their "tweets that criticized the President or his policies," Stip. at 1, is not viewpoint-neutral, and is therefore impermissible "regardless of how the property is categorized under forum doctrine," Wandering Dago, 879 F.3d at 39.

These replies will appear in the muting account's notifications if the muting account follows the muted account. Of course, the fact that one account follows a second account strongly indicates some desire by the first user to engage with the second user. Stip. ¶ 19.

We do not analyze separately the argument that the blocking of the individual plaintiffs violates their right "to petition the Government for a redress of grievances" under the First Amendment's Petition Clause. The First Amendment right to speech and petition "are inseparable," and generally "there is no sound basis for granting greater constitutional protection" to one over the other. McDonald v. Smith, 472 U.S. 479, 485, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). "There may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis," Borough of Duryea v. Guarnieri, 564 U.S. 379, 389, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011), but this case does not present one of them.